IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * * * | 3:03-CR-00018 |
| Plaintiff, | * * | |
| v. | * * | |
| FREDERICK DODD, | * * | ORDER GRANTING COMPASSIONATE RELEASE |
| Defendant. | * * | |

Before the Court is Defendant Frederick Dodd's Motion for Compassionate Release, filed by the Federal Public Defender (FPD) on June 24, 2020. ECF No. 810. The Government filed its Resistance on July 21. ECF No. 813. The matter is fully submitted.

## I. BACKGROUND

On August 12, 2005, this Court sentenced Defendant to 360 months of imprisonment for distributing crack and powder cocaine.[1] ECF No. 769. Defendant was thirty-four years old then and already had been in federal custody for more than two years. ECF No. 322 ¶ 5.

In short, Defendant had spent several years selling and directing others to sell drugs. ECF No. 322 ¶ 7. Defendant, his brother, and his uncle also beat an individual they suspected (correctly) of working with law enforcement in 2002. *Id.* ¶¶ 38, 54. Defendant also had convictions for low-level theft, domestic violence, and some marijuana possession. *Id.* ¶¶ 72–76.

Congress then passed the First Step Act of 2018. *See* Pub. L. No. 115-391, 132 Stat. 5194. The Act allowed courts to retroactively apply previously lowered mandatory sentencing ranges for crimes involving crack cocaine. *See* ECF No. 769. The Court thus lowered

---

[1] The Court originally sentenced Defendant to life imprisonment as then required by the U.S. Sentencing Guidelines. ECF No. 320. The Eighth Circuit vacated that sentence following the Supreme Court's decision in *Booker v. United States*, 543 U.S. 220 (2005). ECF No. 365.

Defendant's sentence to 275 months of imprisonment to be followed by four years of supervised release. *Id.* The Federal Bureau of Prisons (BOP) is now scheduled to release Defendant on March 8, 2024. ECF No. 813 at 2.

Of course, the Court resentenced Defendant in 2019, a very different year from 2020. The virus known as COVID-19 has killed more than 146,000 Americans and infected more than 4.2 million in a few months. *Mortality Analysis*, Johns Hopkins U. & Med. (July 27, 2020, 3:00 AM), https://coronavirus.jhu.edu/data/mortality. "At this time, there is no known cure, no effective treatment, and no vaccine. Because people may be infected but asymptomatic, they may unwittingly infect others." *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613 (2020) (Roberts, C.J., concurring).

Despite some drastic efforts this spring, the virus has not gone away. *E.g.*, Arian Campo-Flores et al., *U.S. Policy Patchwork Spurs New Covid Surge*, Wall St. J., July 10, 2020, A1. Once again, many states have limited access to almost any place where there are too many people and too little space to keep the virus from spreading. This includes prisons. Already "tinderboxes for infectious disease," prisons now are even more dangerous than we typically accept. *United States v. Rodriguez*, No. 2:03-CR-00271-AB-1, 2020 WL 1627331, at *1 (E.D. Pa. Apr. 1, 2020).

At least 4311 inmates and 401 BOP employees have "open" and "confirmed" cases.[2] *COVID-19 Cases*, Fed. Bureau Prisons (July 27, 2020), https://www.bop.gov/coronavirus/. One hundred inmates and an employee have died. *Id.* Meanwhile, 4940 inmates and 502 staff have had the virus but recovered. *Id.* The pandemic is no distant threat at Defendant's prison, FCI

---

[2] These numbers skyrocketed during July. *See United States v. Clark*, No. 4:08-CR-00096, 2020 WL 3395540, at *2 (S.D. Iowa June 17, 2020) (noting that 1209 inmates and 168 BOP employees have open and confirmed cases).

Forrest City Low in Arkansas. Of its 1866 total inmates, 641 have had the virus and recovered, 29 have active cases, and 2 inmates have died. *Id.* In sum, it has had one of the largest COVID-19 outbreaks in the federal prison system.

The BOP indeed faces a daunting task. It has undertaken emergency measures to halt the virus's spread. *Id.* Social visits are cancelled, prisoner movement is limited, and legal visits are suspended subject to exception. *Id.* Even so, the virus has continued to spread despite months of such measures because no prison can be truly quarantined. New prisoners continue to arrive, and guards continue to traverse to and from the unquarantined world.

On May 1, 2020, Defendant requested compassionate release from his warden pursuant to 18 U.S.C. § 3582(c)(1)(A), another First Step Act provision. ECF No. 810-1 at 1. He argued the prison's outbreak and the need to protect "individuals at significantly higher risk of adverse health consequences from the virus," including Defendant, supported compassionate release or home confinement. *Id.* There is no indication the warden responded. ECF No. 810 at 2.

It appears the warden would have denied the motion. A BOP doctor who viewed Defendant's medical record concluded that "[h]is chances of contracting COVID-19 [are] worse in the communities at this time." ECF No. 813-2 at 7. A doctor hired by the FPD concluded the opposite. Citing Defendant's chronic kidney disease, among other conditions,[3] the FPD's doctor concluded Defendant "is at greatly increased risk for severe complications and/or death were he to contract [COVID-19]." ECF No. 810-2 at 3.

## II. ANALYSIS

The First Step Act amended numerous provisions of the U.S. Code to promote rehabilitation of prisoners and unwind decades of mass incarceration. Cong. Research Serv.,

---

[3] Defendant has battled leukemia for years, but that malady appears to be in remission. ECF No. 810-2 at 2.

R45558, *The First Step Act of 2018: An Overview* 1 (2019).  Congress designed the statute at issue here, § 3582(c)(1)(A), for "Increasing the Use and Transparency of Compassionate Release."  § 603(b), 132 Stat. at 5239.  This provision allows defendants, for the first time, to petition district courts directly for compassionate release.  *Id.*  Under the old regime, defendants could petition only the BOP Director, who could then make a motion, at his or her discretion, to the district court.  *See* U.S. Sentencing Guidelines Manual § 1B1.13 cmt. n.4 (U.S. Sentencing Comm'n 2018) [hereinafter U.S.S.G.].  The Director rarely did so.  *Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice).

### A.  *Exhaustion*

The First Step Act's gatekeeping provision created two ways for a defendant to bring a compassionate release motion to a district court.  The defendant may file a motion after he "has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf *or* the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."  § 3582(c)(1)(A) (emphasis added).

Here, Defendant satisfied the gatekeeping provision because thirty days have passed since the BOP received his request.[4]  ECF No. 810 at 2.  The Court may address the merits.

### B.  *Merits*

Compassionate release provides a path for defendants with "extraordinary and compelling reasons" to leave prison early.  § 3582(c)(1)(A)(i).  Such a sentence reduction must

---

[4] The Government also does not question whether Defendant satisfied § 3582(c)(1)(A)'s gatekeeping requirement.  *See* ECF No. 813; *see also United States v. Alam*, 960 F.3d 831, 834 (6th Cir. 2020) (holding § 3582(c)(1)(A)'s gatekeeping requirement is a non-jurisdictional claim-processing rule that the Government can waive or forfeit).

4

comply with the 18 U.S.C. § 3553(a) factors and "*applicable* policy statements issued by the Sentencing Commission." § 3582(c)(1)(A) (emphasis added).

1. Extraordinary and Compelling Reasons

Congress never defined what constitutes "extraordinary and compelling." *See* 28 U.S.C. § 994(t). Instead, Congress directed the Sentencing Commission to promulgate "the criteria to be applied and a list of specific" extraordinary and compelling examples. *Id.* Before the First Step Act, the Commission provided just three: severe illness, an elderly inmate's rapidly declining health, and care for dependent family members. U.S.S.G. § 1B1.13 cmt. n.1.

The Commission also provided a catch-all provision that allows the BOP Director to determine "there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the" examples described above. *Id.* § 1B1.13 cmt. n.1(D). That still begs the question: what is extraordinary and compelling? Congress gave only one guidepost. "Rehabilitation of the defendant *alone* shall not be considered an extraordinary and compelling reason." § 994(t) (emphasis added). So rehabilitation is insufficient to be eligible for release, but its mention by Congress indicates rehabilitation may be considered.

Courts otherwise are left to themselves because the Commission never updated its policy statement for the First Step Act.[5] Rather, the outdated policy statement still assumes compassionate release "may be granted only upon motion by the Director of the Bureau of Prisons." U.S.S.G. § 1B1.13 cmt. n.4. This left district courts in a conundrum. On the one hand, Congress said it wished to "[i]ncreas[e] the [u]se . . . of [c]ompassionate [r]elease,"

---

[5] The Commission cannot amend its guidelines until it again has four voting commissioners. *United States v. Cantu*, 423 F. Supp. 3d 345, 348 n.1 (S.D. Tex. 2019) (quoting *United States v. Handerhan*, No. 1:10-CR-00298, 2019 WL 1437903, at *1 n.4 (M.D. Pa. Apr. 1, 2019)). The Commission still has only two voting members. *About the Commissioners*, U.S. Sentencing Comm'n, https://www.ussc.gov/commissioners (last visited July 27, 2020).

§ 603(b), 132 Stat. at 5239, by allowing district courts to grant petitions "consistent with *applicable* policy statements" from the Commission, § 3582(c)(1)(A) (emphasis added). On the other hand, the Commission did not produce a policy statement applicable to the new statute.

Many courts, including this one, have concluded this means the Commission lacks an applicable policy statement regarding when a court can grant compassionate release. *United States v. Brown*, No. 4:05-CR-00227-1, 2020 WL 2091802, at *6 (S.D. Iowa Apr. 29, 2020), *appeal dismissed following government request*, No. 20-2053 (8th Cir. June 16, 2020); *United States v. Haynes*, No. 93 CR 1043 (RJD), 2020 WL 1941478, at *14 (E.D.N.Y. Apr. 22, 2020) (citing thirteen such cases). And in the absence of an applicable policy statement, "the Court can determine whether any extraordinary and compelling reasons other than those delineated in" the Commission's outdated commentary support release. *Cantu*, 423 F. Supp. 3d at 352; *see also United States v. Fox*, No. 2:14-CR-03-DBH, 2019 WL 3046086, at *3 (D. Me. July 11, 2019) (treating "the previous BOP discretion to identify other extraordinary and compelling reasons as assigned now to the courts"). The result is that the district court can consider anything—or at least anything the BOP could have considered—when assessing a defendant's motion. This now "appears to be the majority position." *United States v. Scott*, No. 17-CR-156, 2020 WL 2508894, at *8 (E.D. Wis. May 15, 2020).

The Government continues to reject this view. ECF No. 813. Hearing no persuasive arguments to the contrary, the Court continues to embrace it.[6] *See, e.g.*, *United States v. Jacobs*, No. 4:19-CR-00149, 2020 WL 3637625, at *4 (S.D. Iowa July 2, 2020); *United States v. Clark*, No. 4:08-CR-00096, 2020 WL 3395540, at *4 (S.D. Iowa June 17, 2020). In sum, if the First

---

[6] The Eighth Circuit recently declined to answer the inverse of this issue: whether a district court commits error in *adhering* to the Commission's dated policy statement. *United States v. Rodd*, No. 19-3498, 2020 WL 4006427, at *6 (8th Cir. July 16, 2020).

Step Act is to increase the use of compassionate release as intended, the most natural reading of § 3582(c) is that the district court assumes the same discretion as the BOP Director when it considers a compassionate release motion properly before it.

2.  COVID-19 and Defendant's Preexisting Conditions

The district courts holding that the COVID-19 pandemic constitutes an extraordinary and compelling reason for release are legion.[7] It then necessarily follows that COVID-19 presents a still-greater extraordinary and compelling reason for release when a defendant's prison is battling a bona fide outbreak. *United States v. McLin*, No. 1:17-CR-110-LG-RHW, 2020 WL 3803919, at *3 (S.D. Miss. July 7, 2020) (finding that "the threat posed by COVID-19 at FCI Forrest City Low, in conjunction with McLin's medical vulnerability, weigh[ed] in favor of his release" but ultimately concluding the § 3553(a) factors barred release); *United States v. McCall*, No. 2:18CR95-MHT, 2020 WL 2992197, at *7 (M.D. Ala. June 4, 2020) (finding "the

---

[7] *E.g.*, *United States v. Johnson*, No. CR H-96-176, 2020 WL 3618682, at *3 (S.D. Tex. July 2, 2020); *United States v. Young*, No. 14-CR-30024-2, 2020 WL 3605025, at *2 (C.D. Ill. July 2, 2020); *United States v. Plank*, No. 17-20026-JWL, 2020 WL 3618858, at *3 (D. Kan. July 2, 2020); *United States v. Tillman*, No. 12-CR-2024-CJW-MAR, 2020 WL 3578374, at *5 (N.D. Iowa June 30, 2020); *United States v. Ollie*, No. CR 1:12-09, 2020 WL 3469754, at *3 (W.D. Pa. June 24, 2020); *United States v. Williams*, No. 06-CR-0143 (WMW/FLN), 2020 WL 3097615, at *2 (D. Minn. June 11, 2020); *United States v. Nazzal*, No. 10-20392, 2020 WL 3077948, at *4 (E.D. Mich. June 10, 2020); *United States v. Mason*, No. 317CR104CWRLRA3, 2020 WL 3065303, at *2 (S.D. Miss. June 9, 2020); *United States v. Conner*, No. CR07-4095-LTS, 2020 WL 3053368, at *7 (N.D. Iowa June 8, 2020); *United States v. Moore*, No. 3:16-CR-00171-JO, 2020 WL 2572529 (D. Ore. May 21, 2020); *United States v. Galloway*, No. RDB-10-0775, 2020 WL 2571172 (E.D. Mich. May 21, 2020); *United States v. Parker*, No. 2:98-cr-00749, 2020 WL 2572525 (C.D. Cal. May 21, 2020*); United States v. Schneider*, No. 14-CR-30036, 2020 WL 2556354, at *1 (C.D. Ill. May 20, 2020); *United States v. Hill*, No. 3:19-cr-00038 (JAM), 2020 WL 2542725 (D. Conn. May 19, 2020); *United States v. Bright*, No. 2:15CR00015-005, 2020 WL 2537508 (W.D. Va. May 19, 2020); *United States v. Bischoff*, No. 17-cr-196-JD, 2020 WL 2561423 (D.N.H. May 18, 2020); *United States v. Cotinola*, No. 13-CR-03890-MV, 2020 WL 2526717, at *3 (D.N.M. May 18, 2020); *United States v. Rountree*, No. 1:12-CR-0308 (LEK), 2020 WL 2610923 (N.D.N.Y. May 18, 2020); *United States v. Bess*, No. 16-CR-156, 2020 WL 1940809, at *9 (W.D.N.Y. Apr. 22, 2020); *United States v. Smith*, No. 12 CR. 133 (JFK), 2020 WL 1849748, at *4 (S.D.N.Y. Apr. 13, 2020); *United States v. Hernandez*, No. 18 CR. 834-04 (PAE), 2020 WL 1684062, at *3 (S.D.N.Y. Apr. 2, 2020); *Rodriguez*, 2020 WL 1627331, at *1; *United States v. Jepsen*, No. 3:19-CV-00073(VLB), 2020 WL 1640232, at *5 (D. Conn. Apr. 1, 2020); *United States v. Campagna*, No. 16 CR. 78-01 (LGS), 2020 WL 1489829, at *1 (S.D.N.Y. Mar. 27, 2020).

overwhelming number of COVID-19 cases at Forrest City Low," in combination with other factors, constituted extraordinary and compelling reasons for release).  This particularly is so when an inmate has preexisting health conditions that increase the likelihood of COVID-19 complications.  Chronic kidney disease is one such condition.  *People with Certain Medical Conditions*, Ctrs. for Disease Control & Prevention (July 17, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html ("Having chronic kidney disease of any stage increases your risk for severe illness from COVID-19.").  Hypertension *might* be another.[8]  *Id.*  Thus, Defendant's chronic kidney disease and presence in a federal prison with an ongoing COVID-19 outbreak would seem to constitute extraordinary and compelling reasons under § 3582(c)(1)(A).

The Government raises two points in rebuttal.  First, the Government argues the BOP is perfectly capable of treating Defendant's hypertension and chronic kidney disease, as it has for years.  ECF No. 813 at 6.  Assuming for the sake of argument that is true,[9] that still misses the point.  Rather, the Court's concern is that Defendant's preexisting medical conditions create an untenable risk of death should Defendant contract a lethal, easily spread virus for which "there is no known cure, no effective treatment, and no vaccine."  *S. Bay United Pentecostal Church*, 140 S. Ct. at 1613 (Roberts, C.J., concurring).

And second, the Government argues Defendant faces a greater risk from COVID-19 if free in the community than within Forrest City Low.  ECF No. 13 at 7; ECF No. 13-2 at 7.  The logic goes like this: (1) Defendant wishes to be under home confinement with his sister in North

---

[8] The FPD's doctor believes Defendant's hypertension increases the risk of COVID-19 complications, but mainly because it "is not well controlled, and uncontrolled blood pressure both causes and exacerbates chronic kidney disease."  ECF No. 810-2 at 3.

[9] The FPD's doctor also asserted that Defendant's "kidney disease is not being managed in a timely manner by the BOP medical system."  ECF No. 810-2 at 2.

Las Vegas, Nevada.  (2) Clark County Nevada, which contains North Las Vegas, has experienced a COVID-19 resurgence like the rest of the United States.  (3) More people per day test positive in Clark County than in Forrest City Low.  (4) Therefore, Defendant is safer in Forrest City Low.

One problem with this logic is that it requires focusing on certain numbers and ignoring others.  For instance, one could also say that *thirty-six percent* of Forrest City Low's 1866 inmates either have COVID-19; have had COVID-19; or have died from COVID-19.[10]  This stands in marked contrast to Clark County, Nevada, where 1.65% of the population has tested positive for COVID-19.[11]  Another problem is that even with Clark County's recent case surge, this argument also misses the point.  In Las Vegas, Defendant would have the power to take all health precautions he deems necessary.  At Forrest City Low, Defendant lacks that power, and the BOP apparently lacks the ability or will to take those precautions for him.  Thus, Defendant presents an extraordinary and compelling reason for a sentence reduction because he is incarcerated in a COVID-19 hotspot while battling at least one preexisting ailment that would make a case of COVID-19 particularly deadly.

3. § 3553(a) Factors

The Court must also consider if compassionate release comports with any applicable § 3553(a) factors.  § 3582(c)(1)(A).  The Court's lodestar is to ensure the sentence is "sufficient, but not greater than necessary."  § 3553(a).  In Defendant's case, the "nature and circumstances

---

[10] As discussed above, 641 Forrest City Low inmates have had the virus and recovered, 29 have active cases, and 2 inmates have died.  *COVID-19 Cases*, Fed. Bureau Prisons (July 27, 2020), https://www.bop.gov/coronavirus/.

[11] Clark County has recorded 37,492 cases, a figure that nearly doubled in July.  *Total COVID-19 Cases*, S. Nev. Health Dist. (July 28, 2020), http://www.southernnevadahealthdistrict.org/covid-19-dashboard/.  Even so, in 2019, Clark County had an estimated population of 2,266,715.  *Quick Facts: Clark County, Nevada*, U.S. Census Bureau, https://www.census.gov/quickfacts/clarkcountynevada (last visited July 28, 2020).

of the offense"—a long period of distributing crack cocaine—are serious. § 3553(a)(1). Of course, the Court must also recognize the U.S. Code has long mandated longer sentences for distributors of crack cocaine than those of powder cocaine. *Kimbrough v. United States*, 552 U.S. 85, 98 (2007). The resulting racial disparity in sentence lengths is well-documented. *Id.* Defendant no doubt benefitted from Congress's recent attempts to correct that unfairness. *See* ECF No. 769. Yet that disparity, if softened, persists. U.S. Sentencing Comm'n, *Report to the Congress: Fair Sentencing Act of 2010*, 23 (2015).

With respect to "characteristics of the defendant," § 3553(a)(1), the Court must assess Defendant as a whole person. *Koon v. United States*, 518 U.S. 81, 113 (1996). Defendant had a criminal record before this offense and at least some history of violence. *See* ECF No. 322 ¶¶ 38, 72–76. The Court particularly remains troubled by Defendant's beating of an individual who was cooperating with law enforcement. *See id.* ¶¶ 38, 54. But the Court also must recognize Defendant did not act alone when he attempted to obstruct justice through force. The Court released one of Defendant's accomplices in that beating, his uncle Anthony Dodd, pursuant to the First Step Act last year. ECF No. 778. Anthony Dodd appears to have remained out of trouble, suggesting that participation in such loathsome conduct eighteen years ago does not dictate how an individual will act once released.

Defendant also now is nearly fifty-one years old, making him about half as likely to be convicted of a new crime as a defendant released in his thirties. U.S. Sentencing Comm'n, *The Effects of Aging on Recidivism Among Federal Offenders* 23 (2017). Defendant's behavioral record during the past twelve years also has been all-but spotless. His only infractions have been for having a cell phone. ECF No. 813-1 at 1. This suggests the characteristics of Defendant today are not as they were at sentencing. And although Defendant did not accept responsibility

because he took his case to trial, the Court cannot blame him.  Under the pre-*Booker* sentencing regime, Defendant faced a mandatory life sentence even with a Guidelines reduction for acceptance of responsibility.  The Court was not privy to plea negotiations, but it appears Defendant had nothing to lose if he exercised his Sixth Amendment right to a jury trial.

      At resentencing, the Court concluded Defendant's conduct warranted a "harsh sentence," and it stands by that assessment.  *See* ECF No. 463 at 45:1–2.  Even so, it is hard to argue seventeen years in federal prison is anything other than harsh, and the "need" for more incarceration is weaker after all that time.  § 3553(a)(2).  Defendant certainly has served more than what Congress determined to be the minimum punishment for his conduct.  *See* § 841(b)(1)(B).  Given the nature of Defendant's convictions and nonviolent behavior in prison, incarceration is not necessary "to protect the public from further crimes of the defendant." § 3553(a)(2)(C).  The BOP at least somewhat agrees; it reduced his "high" security classification to "medium" in 2005 and to "low" in 2009.  ECF No. 810-7 at 15.  The Court has long believed "a reasonable sentence is one that at least allows the defendant some hope that the last remaining years of his life could be lived outside of prison."  ECF No. 463 at 45:6–8.  Given Defendant's ailments and the outbreak at Forrest City Low, that belief counsels in favor of release.

      Nor is incarceration the only "kind[] of sentence available."  § 3553(a)(3).  Noncustodial sentences also curtail "prized liberty interests" and "the Defendant always *faces the harsh consequences that await if he violates the conditions*" attached to such a sentence.  *United States v. Gall*, 374 F. Supp. 2d 758, 763 (S.D. Iowa 2005) (emphasis added), *rev'd*, 446 F.3d 884 (8th Cir. 2006), *rev'd*, 552 U.S. 38 (2007).  Such restrictions also promote respect for the law, protect the public, and do not constitute any endorsement of Defendant's conduct.  *See id.*

It is as true now as it was at Defendant's sentencing that the Guidelines counsel in favor of a longer sentence. ECF No. 769. But they are advisory and constitute just one factor. *See* § 3553(a)(4). Furthermore, the fact Defendant has satisfied the mandatory minimum sentence for his offense means his release will not create a drastic sentencing disparity with defendants "who have been found guilty of similar conduct." § 3553(a)(6). The Court would have been well within its discretion to resentence Defendant to 204 months' imprisonment. Had it known the twilight of Defendant's sentence would involve incarceration during a global pandemic that is particularly dangerous for those with Defendant's medical history, it would have done so.

As the Court has repeatedly noted as of late, a decision does not cease to be an "exercise of reason simply because it is also an exercise of compassion." *United States v. Likens*, 464 F.3d 823, 827 (8th Cir. 2006) (Bright, J., dissenting), *cited with approval in Gall*, 552 U.S. at 52 n.7. The Court grants Defendant's Motion for Compassionate Release because it is supported by extraordinary and compelling reasons as well as the § 3553(a) factors.

### C. *Release Plan*

Defendant's remaining term of imprisonment shall be served as a term of supervised release following a fourteen-day quarantine period with the BOP that begins July 29, 2020. When that supervised release term expires on his current release date,[12] he shall then serve the four-year term of supervised release already imposed. *See* ECF No. 769. Both terms of supervised release are subject to the conditions listed in the 2005 Judgment. *See id.*

The U.S. Probation and Pretrial Services Office (USPO) shall assist Defendant in his efforts to secure employment, and Defendant shall accept and comply with such assistance. Defendant also shall reside at the home of his sister, Francesca Dodd, at the address listed in

---

[12] Defendant is scheduled to be released March 8, 2024. ECF No. 813 at 2.

Defendant's sealed Motion. *See* ECF No. 810 at 11. Any change in address is subject to USPO approval. Upon release, Defendant shall contact the District of Nevada USPO within seventy-two hours.

### III.  CONCLUSION

For the reasons stated herein, Defendant's Motion for Compassionate Release (ECF No. 810) is GRANTED.

IT IS SO ORDERED.

Dated this 29th day of July 2020.

_____
ROBERT W. PRATT, Judge
U.S. DISTRICT COURT